**SO ORDERED: June 22, 2010.**




Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LISA L. RALPH | ) | CASE NO. 09-11537-AJM-7 |
| | ) | |
| Debtor | ) | |
| | ) | |
| LISA L. RALPH | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| vs. | ) | No. 09-50694 |
| | ) | |
| FORUM CREDIT UNION | ) | |
| | ) | |
| Debtor | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried before the Court on May 6 and May 12, 2010.  The

Plaintiff, Lisa Ralph ("Plaintiff") appeared in person and by counsel, Matthew W.

Conrad.  The Defendant, Forum Credit Union ("FCU") appeared by representatives and

1

by counsel, Todd H. Belanger. The Court now makes its findings as conclusions pursuant to Fed. R. Bankr. Pro. 7052.

### *Findings of Fact*

1. The Plaintiff purchased a 2003 Nissan Maxima automobile (the "Vehicle") from Tom Rousch, Inc. ("Dealer") for approximately $24,000. To secure payment of the Vehicle, the Plaintiff entered into a retail installment contract and security agreement (the "contract") and granted the Dealer a security interest in the Vehicle. The Contract provided that the Plaintiff would make 72 monthly installment payments of $438.26. The Contract also provided that if the Plaintiff's payment was more than 10 days late, she would be charged $16.00. Payments were to have commenced on February 20, 2006. The contract was subsequently assigned to FCU.

2. The Plaintiff began to fall behind on her payments under the Contract. Over the course of the Contract until August, 2009, the Plaintiff was late on her payments at least 28 times. By August, 2009, the Plaintiff's account delinquency was $873.04.

3. At about 4:20 p.m. on August 5, 2009, FCU employee Shawn Sullivan ("Sullivan") using a number that had been given to FCU by the Plaintiff, called that number and talked to Carole Nellis ("Nellis"), the Plaintiff's mother. Sullivan identified herself as calling from FCU and said it was in reference to the Vehicle. Nellis was at first surprised that the number had been given as a contact number. Sullivan asked Nellis if the Plaintiff lived there, to which Nellis replied no. Sullivan then read off another telephone number (ending in 9298) and asked Nellis if that was the Plaintiff's telephone number to which Nellis replied that she wasn't sure but that she (Nellis) could

contact the Plaintiff on her cell phone.  Sullivan told Nellis that she (Sullivan) needed to speak to the Plaintiff that night. Nellis indicated that she would email the Plaintiff with the information but preferred to "stay out of this".  *Shawn Sullivan Call #1, Entry No.8, Plaintiff's Exhibit 3.*

      4.     At about 4:21 p.m. on August 5, 2009, Sullivan called a number ending in 9363 and left a voice mail message for the Plaintiff indicating FCU has left several messages and that the Plaintiff needed to contact FCU by that night.  Sullivan also included the FCU telephone number in that message. *Shawn Sullivan Call #2, Entry No.9, Plaintiff's Exhibit 3.*

      5.     The day after, on August 6, 2009, the Plaintiff contacted FCU using her cell phone and spoke with FCU employee Molley Miller.  The Plaintiff indicated to Miller that the telephone number ending in 9298 was "not a good number" at which the Plaintiff could be reached.  After verifying certain personal information for account security purposes, Plaintiff told Miller that she would be filing bankruptcy the next day and intended to surrender the Vehicle.  Upon hearing this information, Miller transferred the call to a gentleman from the FCU collections department, which, from the collection activity log that was admitted as Plaintiff's Exhibit #2, appears to be Joshua Lett.  The Plaintiff reiterated that she was filing bankruptcy, to which Lett asked for the bankruptcy case number. The Plaintiff explained she did not have a case number as she had not yet filed bankruptcy , but that she was filing the next day.  The Plaintiff gave Lett the name of her bankruptcy attorney and the attorney's contact information.  Lett clearly stated that the Plaintiff's attorney was to give FCU the bankruptcy case number, and that the Plaintiff's attorney should contact FCU because that was what the Plaintiff was

"paying him for".  Lett also clearly stated that, until FCU received the bankruptcy case number, collection activity would continue.  *Molley Miller Call, Entry No. 7, Plaintiff's Exhibit 3*.  Indeed, the notation on Plaintiff's Exhibit 2 with respect to this call bears this out as it provides, "I ADV COLL ACTIVITY WILL CONTINUE UNTIL WE REC NOTIFICATION".

6.  The Plaintiff's chapter 7 bankruptcy case was filed electronically on 5:58 p.m. on August 7, 2009.  On August 11, 2009, the "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors and Deadlines" (the "341 meeting notice") was issued, in which the bottom third of the first page of that notice entitled "Creditors May Not Take Certain Actions" indicated that in most cases, the filing of a bankruptcy case automatically stays certain collection actions.  The certificate of service issued on August 13, 2009 indicates that the 341 meeting notice was sent by email to: "BK@FORUMCU.COM, FORUM Credit Union, 11313 USA Pkwy, Fishers, IN 46037-9208 on August 11, 2009 at 7:48 p.m.

7.  FCU apparently captured the Plaintiff's cell phone number by caller ID when the Plaintiff called FCU on August 6th , because FCU employee Cassie Denzler ("Denzler") called the Plaintiff's cell phone number at 5:05 p.m. on August 12, 2009.  The Plaintiff answered and Denzler asked if she was ready to make a payment on the Vehicle to which the Plaintiff responded that she had filed bankruptcy.  When Denzler asked the Plaintiff for the bankruptcy case number, the Plaintiff responded that she didn't have it as she was driving in her car.  When Denzler asked if the Vehicle was at the Plaintiff's residence on Backwater Drive, or whether she was driving the Vehicle, the Plaintiff replied "I'm not even supposed to be talking to you" and hung up.  *Cassie*

4

*Denzler Call #1, Entry No 3, Plaintiff's Exhibit 3*

8.      Denzler at 5:09 p.m on that same day called Nellis and asked for the Plaintiff, to which Nellis replied that she wasn't there and that she was not sure whether the Plaintiff was out of town. Nellis did say that she'd be seeing the Plaintiff in the next week and would give her the message that FCU was trying to contact her. *Denzler Call #2, Entry No. 4, Plaintiff's Exhibit 3.*

9.      At about 9:06 a.m. the next morning (August 13, 2009) attorney James Geiger, a law partner of the Plaintiff's counsel, called FCU employee Jason Anderson and in a firm tone noted that the Plaintiff had received a call the day before and that he was calling to give FCU the bankruptcy number. Geiger also reminded Anderson that the automatic stay was in effect and that FCU should no longer contact the Plaintiff. Anderson must have mentioned that, without the case number the day before, FCU could only "guess" whether the Plaintiff had filed bankruptcy because Geiger told him "you don't have to guess...she did". Anderson then replied that people tell him all the time that they've filed bankruptcy. Geiger gave Anderson the bankruptcy case number and Alexander noted that he would relay the information. *Anderson Call #1, Entry No. 5, Plaintiff's Exhibit 3.*

10.     Less than an hour later, at 9:44 a..m., FCU bankruptcy specialist Charles Soules ("Soules") placed the Plaintiff's account on hold, "recoded the system" to show that the Plaintiff was in bankruptcy, and forwarded the file to his counsel. At 4:36 and 4:40 p.m on that day, automated calls that had already been set in motion the night before (and which could not be retracted) were made to the Plaintiff's home and cell phones. Neither call was answered and the cell phone call was sent to voice mail.

11. On August 31, 2009, over three weeks after she filed her chapter 7 case, the Plaintiff surrendered the Vehicle at FCU's Avon branch.

12. The Plaintiff commenced this adversary proceeding by filing on November 11, 2009 her Complaint for Willful Violations of the Automatic Stay.

### *Conclusions of Law*

1. The Plaintiff alleges that FCU willfully violated the automatic stay by placings calls to her mother on the morning of August 12, 2009 and by allowing automated telephone calls to be made to the Plaintiff in the afternoon of August 13, 2009. For such alleged willful violations, the Plaintiff seeks damages, including attorney's fees incurred in filing and prosecuting this adversary proceeding, and punitive damages.

2. Code [1] Sections 362(a) (3) and (6) collectively provide that the filing of a bankruptcy petition operates as a stay of an act to obtain possession of property of the estate or to collect a claim against a debtor that arose before the commencement of the case. Code Section 362(k)(1) provides that an individual injured by any *willful* violation of a stay shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive damages.

3. A plaintiff seeking to recover damages under Code Section 362(k) (1) for willful stay violations must prove by a preponderance that (1) a bankruptcy petition was filed; (2) the aggrieved debtor is an "individual"; (3) the creditor had notice of the

---

[1] All references to "Code" shall mean "Bankruptcy Code", 11 U.S.C. §101, et seq.

petition; (4) the creditor's actions were willful and violated the stay; and (5) the debtor is entitled to a form of relief provided by §362(k). *In re Galmore*, 390 B.R. 901 (Bankr. N. D. Ind. 2008).

4.   The "notice" element requires only that the creditor had knowledge the of the pending bankruptcy petition when the violation occurred -whether that knowledge be acquired "through formal notice or otherwise". *Id* at 907. A telephone call to the creditor informing the creditor of the pending bankruptcy may constitute actual notice. *In re Rowe,* 253 B.R. 524, 528-29 (E.D. Mich. 2000). .

5.   For the violation to be "willful", the creditor need only intend to commit the act that led to the violation; the debtor need not prove that the creditor specifically intended to violate the stay. *Galmore,* 390 B.R. at 907; *In re Kline*, 424 B.R. 516, 524 (Bankr. N.M. 2010).

6.   Here, there is undisputed evidence that FCU acquired knowledge of the Plaintiff's bankruptcy petition at the earliest on August 12th when Denzler called the Plaintiff on her cell phone in her car and the Plaintiff informed Denzler that she had filed bankruptcy. So, to the extent FCU committed acts to collect the debt owed to between August 7 and August 12th, such violations are merely technical for which no damages can be given. *Galmore,* 390 B.R. at 906; *Kline*, 424 B.R. at 523.

7.   Denzler did contact Nellis, the Plaintiff's mother, immediately after speaking with the Plaintiff on August 12th. Denzler did not mention to Nellis that the Plaintiff's FCU account was in default, but merely asked Nellis if she knew where the Plaintiff was and if Nellis could tell the Plaintiff that FCU was trying to reach her. Nellis testified that FCU did not tell her that the Plaintiff had filed bankruptcy. There is no

7

evidence to suggest that the call to Nellis was coercive or rude or that its purpose was to collect the debt owed by the Plaintiff or to assert control over the Vehicle.  Nor was there evidence that the call to Nellis had the effect of harassing the Plaintiff.  Rather, it was a call made to a number — given to FCU by the Plaintiff – to inquire as to the Plaintiff's location, and presumably, the location of the Vehicle.  As such, the call to Nellis on August 12th did not violate the stay.  See, *In re Newcomer,* 416 B.R. 166 (Bankr. D. Md. 2009); *In re Atlas Machine & Iron Works, Inc.*, 239 B.R. 322, 332 (Bankr. E. D. Va. 1998).

    8.    The only other calls made to the Plaintiff after the August 12th call consisted of two automated calls which had been set in motion on August 12th for delivery on August 13th.  There is no evidence to suggest that the act of programming these calls to run the following day was done after FCU was aware of the bankruptcy filing, and thus, the programming of these calls and their subsequent automated run was not an act done with knowledge of the pending bankruptcy.  Even had these calls been programmed after FCU was put on notice of the bankruptcy, they both went unanswered and Plaintiff suffered no damages as a result of the calls being placed.

    9.    Rather, the evidence shows that, once FCU was notified of the bankruptcy case number on August 13th, Soales took the necessary action to cease all collection activity.  Indeed, no further direct contacts with the Plaintiff concerning the collection of the delinquency on the Vehicle occurred after August 12th, the date in which FCU was informed of the Plaintiff's bankruptcy filing.

    10.    The Plaintiff alleges that her primary damages are those she suffered as a result in the "stress and drama" in telling Nellis, her mother, that she filed bankruptcy.

She told Nellis about the bankruptcy, presumably, because Nellis was to testify at the trial.  There was no evidence that Plaintiff incurred expenses in treating her "stress and drama".  Furthermore, FCU never disclosed to Nellis that the Plaintiff had filed bankruptcy; rather, it was the Plaintiff who chose to call Nellis as a witness and thus, disclose to Nellis that she had filed bankruptcy.  But for the fact that the Plaintiff brought this adversary, she would not have suffered any of the damages for which she now seeks compensation.  The Court has concluded that the actions of FCU were not willful and thus, do not give rise to damages under §362(k)(1).  Even had FCU's actions been willful, there was no evidence that the Plaintiff informing Nellis of her bankruptcy caused the Plaintiff compensable injury.

11.    The Plaintiff argues that the attorney fees she incurred in filing and prosecuting this adversary proceeding are damages for which she should be compensated.  This Court recognizes that attorney fees are damages that can be recovered under §362(k)(1).  However, since the Court has concluded that any violations of the stay were technical and not willful, damages are not appropriate under §362(k)(1).  Thus, the Court will award no fees.

12.    Having concluded that fees under §362(k)(1) are not warranted, the Court further concludes that an award of punitive damages is not appropriate under the circumstances.

13.    The appropriate judgment entry follows.

# # #

Distribution: Matthew W. Conrad, Attorney for the Plaintiff\ Todd H. Belanger, Attorney for the Defendant / Case Trustee